In the Matter of the Estate of PATRICK O'SULLIVAN, Deceased.

Surrogate's Court, Kings County, March 11, 1940.

*Isidore Rose*, for Patrick J. O'Sullivan, as administrator, etc., petitioner.

*James F. Twohy*, for the respondent.

WINGATE, S. The practice adopted in this proceeding of attempting, in effect, to try an action in replevin in the absence of the court or any other person possessing authority to rule upon the admissibility of testimony and the propriety of questions is strongly to be deprecated. The resulting record is almost invariably a hodge podge, interspersed with irrelevant discussions and gaps in the testimony resulting from unadjudicated objections. Not infrequently the conduct of the examination degenerates into a cacophony of sounds upon which adequate determination of merits becomes difficult if not, indeed, impossible. Whenever a discovery proceeding advances beyond the initial stage of inquisition of a respondent it should invariably be set down upon the contested calendar of the court for regular hearing.

The present record presents an unfortunate example of this condition. Relevant and presumably material testimony has repeatedly been excluded as a result of the interposition of groundless objections. Were a retrial of the issues necessary it would impose a needless and unwarranted hardship on witnesses, some of whom occupy official positions. They have escaped this fate by the narrowest of margins.

The subject-matter of the proceeding is a certain account in the Emigrant Industrial Savings Bank which, on April 23, 1938, the date of this decedent's death, showed a balance of $3,947.44.

The history of this account from the time of its original opening on July 1, 1909, was clearly shown, and the salient facts respecting it are conceded in the memoranda of the opposing parties.

As demonstrated by respondent's Exhibit B, Patrick O'Sullivan was born in County Kerry, Ireland, in or about the year 1869 and emigrated to this country in 1908. He was a laborer by occupation. On July 1, 1909, he opened an account, No. 583,383, in the Emigrant Industrial Savings Bank in his own name with an initial deposit of seventy-five dollars. This account remained continuously in existence until February 16, 1932, although its number was, on July 28, 1914, changed by the bank to No. 712,806. During this period of slightly less than twenty-three years the account shows the making of thirty-six deposits in small amounts ranging from ten dollars, in an aggregate total of $2,340. Of this total, twenty-eight deposits, totaling $1,485, were made in the five years from July 1, 1909, to July 28, 1914; five, totaling $505, in the four years between July 28, 1914, and August 5, 1918, and three, amounting to $350, in the thirteen and a half years between August 5, 1918, and February 16, 1932. No withdrawals whatsoever were made until July 29, 1920, when $100 was taken out. An additional withdrawal of $150 was made on January 30, 1922. These were the only ones during this period of approximately twenty-three years.

As has been noted, this account was originally opened in Patrick's own name and it was carried in this manner without any qualification until February 10, 1923, when a legend was added thereto indicating that it was held on a " Totten " trust for his wife, Mary O'Sullivan. It will be noted that at this time the decedent was approximately fifty-four years of age.

An interruption of the chronological recital of events may be made at this point to note that when Patrick died on April 23, 1938, he had no assets whatsoever and had for over a year been in receipt of public relief.

The inferences arising from this uncontroverted demonstration are interesting. By reason of the nature of his occupation as a laborer Patrick's period of financial productivity was naturally limited to his earlier years of physical strength. The fact of his prompt opening of this savings account, his regular, if modest, additions thereto until he reached the age of fifty, and the fact that during this period no withdrawals whatsoever were made therefrom, all tend strongly to indicate that the purpose motivating his actions in this regard was provision for himself and his dependents in his declining years when he was no longer capable of gainful physical employment.

Misfortune, however, overtook him in the form of the insanity of his wife, Mary. The precise date when this first became established is not disclosed by the record. It does appear, however, that she became an inmate of the Central Islip Hospital for the

Insane at or prior to 1931 and that she has been continuously confined in this institution since that date. Testimony was also adduced to the effect that demands for payment for her care were made of Patrick both before and after February 16, 1932, which is the next important date in the history of the bank account. On that date account No. 712,806, standing in Patrick's name in trust for his now incompetent wife, was closed and its total avails transferred to a new account, No. 1,179,852, in Patrick's name in trust for his daughter, Mary Browne. No deposits or withdrawals were made during its brief continuance which terminated on the following August twenty-ninth, about six months later.

This new account was then closed, and its total balance, amounting to $4,492.98, transferred to a new account, numbered 1,191,169, in the sole name of his daughter, Mary Browne, the present respondent. If this transfer actually amounted to a complete and unconditioned gift to this daughter of Patrick's life savings, accumulated over a period of almost a quarter of a century, and which, so far as appears, constituted the sole asset of this laborer, now well over sixty years of age and presumably without further hope of gainful employment, it was, indeed, a most remarkable transaction.

That it was not intended to effect such an absolute transfer is strongly indicated by the fact that whereas during the entire period since the opening of the account in 1909, Patrick had withdrawn only an aggregate of $250 from the account, $1,003.88 was withdrawn thirty-two days after this transfer. The testimony of the respondent respecting the use of this money is interesting. Her father " was in the bank with me " at the time of withdrawal, and it was made with his " consent." Why such consent on his part was necessary if, as she asserts, she was the unqualified owner of the account, is unexplained. The only additional withdrawal from the account prior to the death of the decedent was of $100 on November 9, 1934, and was made at the request of the decedent and was used to purchase clothes for him.

The attempt of the respondent to convey the impression that the decedent completely pauperized himself by this transfer on August 29, 1932, by an unconditional gift to her of his entire life savings in repayment for her support of her younger sister who had been with her " since 1931 " places an unbearable strain on credulity.

On the composite demonstration of the record the motive for the transfer is wholly obvious. By frugality and conscientious saving the decedent had accumulated a modest competency to ease his declining years. He was now past sixty and misfortune had arrived in the insanity of his wife. The State of New York

was pressing him for payment for her care, for which he was under legal obligation to pay. (Mental Hygiene Law, § 80; *Matter of Fox*, 250 App. Div. 31, 34; affd., 275 N. Y. 604.) He was desirous, if possible, of avoiding this liability and of leaving her maintenance a charge upon the State of New York. To this end he apparently first changed the account to a nominal trust for his daughter, but presumably having been advised that he would still remain liable unless his legal ownership of the account was completely divested, transferred it absolutely to her name about six months later, relying on his faith in her to accord him actual control over it so long as he lived.

That this faith in her was not misplaced is indicated by the fact that during the period of almost six years, from August 29, 1932, to the date of his death on April 23, 1938, during which she possessed legal control over it, only two withdrawals occurred, as hereinbefore detailed, both made only with his approval.

The alteration of her attitude toward the account immediately following his death is not without apparent significance. Within a period of about five months from his demise she made four withdrawals, a number equal to the total made in the period of almost thirty years since the initial opening of the account in 1909.

The composite demonstration raises an almost irresistible inference that the transfer of the account to her in August, 1932, was merely a colorable one, designed to permit him to avoid the accrued and prospective obligations for the support of his wife, and subsequently serving as a basis upon which he was enabled to predicate a claim for personal relief during the final months of his life. Were this determination to be attained the avails of the account must be held to belong to Patrick's estate, since the essential element to a valid gift of an intention to make complete and final transfer of the subject-matter in 1932 would be lacking. (*Matter of Bolin*, 136 N. Y. 177, 180; *Matter of Greenberg*, 158 Misc. 446, 449; *Matter of Powell*, 148 id. 53, 54; *Matter of Vaughan*, 145 id. 332, 338; *Sullivan* v. *Sullivan*, 161 N. Y. 554, 557.)

It is, however, unnecessary to go to the extent of making such a determination in order to award a recovery of this account to the present petitioner. Section 275 of the Debtor and Creditor Law, as added by chapter 254 of the Laws of 1925, provides that " every conveyance made * * * without fair consideration when the person making the conveyance * * * intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors."

The situation of the decedent when he made this transfer on August 29, 1932, was exactly within this description. He was a

superannuated laborer sixty-three years of age whose days of gainful employment were gone forever. He made a conveyance without consideration of his entire life savings, amounting to $4,492.98, despite the fact that he was aware of his existing and continuing obligation for the maintenance of his wife in the Central Islip Hospital, which debt would be utterly beyond his ability to pay as it matured.

It would, under the facts of the case, be equally possible to declare the transfer void under the provisions of section 276 of the Debtor and Creditor Law as one actually intended to hinder, delay and defraud his present and future creditor, the State of New York.

The authority of the present petitioner, as administrator, is unquestionable in this situation. Section 19 of the Personal Property Law is explicit on the subject. So far as pertinent, it reads: " An * * * administrator * * * may, for the benefit of creditors, * * * treat as void * * * any * * * transfer * * * made in fraud of the rights of any creditor * * * and a person who fraudulently receives * * * the personal property of a deceased person, * * * is liable to such * * * administrator * * * for the same or the value thereof."

Here the administrator has elected, pursuant to the terms of the statute, to treat this gratuitous transfer in fraud of creditors as void; being void, title remained in the decedent and passed to the administrator; wherefore, the property transferred or its value is recoverable in this proceeding. (*Matter of Weinberg*, 162 Misc. 867, 875; *Matter of Wilson*, 252 N. Y. 155, 157; *Matter of Lusher*, 159 Misc. 387, 389.)

The balance shown in the account on the date of the decedent's death was $3,947.44, which sum, together with interest from April 23, 1938, the respondent is under obligation to deliver to the administrator.

Enter decree on notice in conformity herewith.